# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 18, 2012

## STATE OF TENNESSEE v. MICHAEL WAYNE DAVIS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1939      Steve R. Dozier, Judge**

---

**No. M2010-02108-CCA-R3-CD - Filed January 9, 2013**

---

A Davidson County Criminal Court Jury convicted the appellant, Michael Wayne Davis, of attempted second degree murder and aggravated assault. The trial court merged the convictions and sentenced the appellant to nineteen years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence sustaining his attempted second degree murder conviction, the trial court's denial of his motion for continuance based upon an unavailable witness, the trial court's admission of an alleged hearsay statement by a witness, and the trial court's admission of his statement that was not timely disclosed during discovery. Upon review, we conclude that there is no error. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Manuel Benjamin Russ, Nashville, Tennessee, for the appellant, Michael Wayne Davis.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Pamela Anderson and Jennifer McMillen, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In a two-count indictment, the Davidson County Grand Jury charged the appellant with the attempted first degree murder and the aggravated assault of the victim, Arcenta Van Harrison. The charges resulted from an altercation between the appellant and the victim

while they were incarcerated at the Charles Bass Correctional Complex ("Charles Bass"). At trial, the fifty-five-year-old victim testified that he had a lengthy history of theft and forgery convictions and that in 2007, he was incarcerated at Charles Bass. The victim said that while he was at Charles Bass, he stayed in guild one and guild twelve. The victim explained that a guild was a building where the inmates were housed. He did not recall leaving prison, being in Vanderbilt Hospital, or being in Nashville General Hospital. The victim remembered being in DeBerry Special Needs Facility ("DeBerry") but could not recall when he first went to that facility. The victim said he knew he had been assaulted, but he did not remember anything about the assault. The victim did not recognize the appellant at trial.

The victim testified that he was under a doctor's care for severe high blood pressure and for continuing mental problems he suffered as a result of the injuries. The victim said that he had trouble remembering things, that he was unable to work, and that he received a disability check. His mother and his sister helped care for him.

Jack Mitchell testified that on November 3, 2007, he was incarcerated at Charles Bass for a forgery conviction and was housed in guild twelve. Mitchell described the guild as a rectangular building with approximately twenty-two "two-man cells" and a guards' office in the center. Mitchell stated that in guild twelve, the inmates were confined to the cells for most of each day. They were released for meals and exercise periods.

Mitchell said that on November 3, he heard shouting outside his cell. His cellmate, who had been walking outside the cell, jumped in the cell and closed the door. Mitchell heard doors slamming as other inmates retreated into their cells. Mitchell looked out his cell's window and saw the appellant "ramming" the victim's head into the door of cell twenty. The victim appeared to be unconscious. The appellant also kicked the victim in the head several times. Mitchell saw chunks of the victim's hair and puddles of his blood on the floor. Mitchell never saw the victim fight back. Eventually, the appellant turned and calmly walked to the back of the guild. Mitchell saw the appellant make a sign or wave.

On cross-examination, Mitchell acknowledged that in addition to the forgery conviction for which he was incarcerated on November 3, he had been convicted of theft and "possession." Mitchell said that he spoke with an investigator within a month of the altercation. Mitchell acknowledged he told the investigator that he heard "a commotion," but he did not mention that he witnessed the incident. Mitchell explained, "I was still in the system and there was a hazard. . . . [W]hen you are in the system like that, you don't tell anything like that unless you want a shank stuck in your back . . . [o]r you want to spend the rest of your time in protective custody."

Valerie Norstad, a registered nurse at Charles Bass, testified that on November 3,

2007, she and other medical personnel responded to an emergency call from guild twelve. When Norstad approached the victim, she heard "a gurgling sound" and saw blood coming out of his mouth. She said that he was breathing and his heart was beating but that he was not responsive or conscious. Norstad had an officer call Vanderbilt Hospital and request an ambulance. The victim did not regain consciousness before being placed in the ambulance. Norstad saw the appellant later that day. She did not see any injuries on the appellant, and she did not treat the appellant for injuries that day.

Marnice Smart-Cruze[1] testified that from July 2007 to January 2008, she worked as a correctional officer at Charles Bass. Officer Smart said that on Saturday, November 3, 2007, she and Corporal Addison were the guards on duty in guild twelve. She said she kept the keys to the cell doors, and Corporal Addison kept the keys to the outside doors.

Officer Smart said that when she arrived between 5:45 and 5:50 a.m. for her shift, everything appeared normal. She saw the victim twice that morning. The first time, he was picking up milk crates from breakfast. The second time, she was in front of the office when the victim brought cereal for Corporal Addison.

Officer Smart said that she was watching the inmates who were having recreation time when she heard "a commotion" behind her. She turned but could not see anything. She went into the office to see if Corporal Addison had heard the noise, but he had not. The victim, who had a big knot on the side of his face, came into the office "to file a disciplinary report, an accident injury report." While Corporal Addison helped the victim fill out the report, Officer Smart went to find the appellant. She found him in the rear bay, and he had no apparent injuries. Officer Smart told the appellant she had to "lock him down" because of an incident involving the victim. The appellant said that "it was horseplay, he was just playing around. It was no harm done." As Officer Smart escorted the appellant to his cell, he repeatedly told her that he was just playing and became irate. When they reached the appellant's cell door, he turned and went to the office. Officer Smart followed the appellant and ordered him to stop, but he did not comply.

The appellant went into the office, yelling at the victim that he was just playing and that a report did not need to be filed. Officer Smart explained that if a report had been filed, the appellant would have lost privileges and been moved to another guild. The appellant and the victim argued, and the appellant attempted to hit the victim but missed. Officer Smart said the men fought in the office and kept "fighting and wrestling" as they went out of the office. Officer Smart ordered the men to stop, but they continued fighting, ending up against the wall between cell 20 and the showers. Officer Smart said that the appellant was larger

---

[1] She testified that she uses the name "Smart."

than the victim.

Officer Smart stated that at first, both men were "gut punching and fighting and talking." Then, the appellant pushed the victim, and the victim's head struck a concrete wall, rendering the victim unconscious. The victim slid down the wall to the floor, which was tile over concrete. As the victim lay on the floor, the appellant, who was wearing boots, jumped on the victim's head and neck with both feet about ten to twelve times. Officer Smart radioed for emergency assistance and again ordered the appellant to stop. Two inmates grabbed the appellant and took him to the rear bay of the guild. Officer Smart saw that the victim's head was bleeding. Although the victim was not conscious, he was breathing, and his fingers were jerking. The appellant extricated himself from the inmates, went to the victim, and repeatedly kicked him on the face and head. Officer Smart radioed for emergency medical assistance.

When yard officers and medics arrived, the appellant went to the rear bay of the guild, put his hands up, and did not say anything. Two officers took the appellant out of guild twelve. Officer Smart did not see any visible injuries on the appellant.

Afterward, Lieutenant Steele asked Officer Smart to go to the hospital with the victim. When she refused, he sent her to guild four, the "maximum security and segregation unit." Officer Smart said that she was "falling apart [because she] had never seen anything like that before." While Officer Smart was working in guild four, she learned that the appellant wanted to talk to her. Officer Smart went to the appellant's cell and sat on the floor in front of the door, crying. She said the appellant apologized for what she saw. Officer Smart asked the appellant why he attacked the victim, and he responded that he was trying to kill the victim. Later, Officer Smart spoke with Agent John Fisher, an investigator with the Tennessee Department of Correction.

On cross-examination, Officer Smart said that the victim had been moved from guild twelve to guild nine a few days prior to the appellant's arrival at Charles Bass from another facility. She explained that the guards were normally informed when an inmate was working and that she knew the victim was serving as kitchen staff that weekend. She acknowledged that after the victim delivered Corporal Addison's cereal, the victim left the office and apparently went to an area of the guild where he should not have been and became involved in the first altercation with the appellant.

Officer Smart said that she knew of no prior relationship between the appellant and the victim that could have precipitated the incident. She said that to her knowledge, Corporal Addison did not call for assistance or help her during the incident.

-4-

Officer Smart said that when she spoke with Agent Fisher approximately three or four weeks later, she did not mention her conversation with the appellant after the fight because Agent Fisher never asked if the appellant made any statements to her.

On redirect examination, Officer Smart said that she never saw the victim with a weapon during the fight and that the appellant never complained of injuries from the fight.

Daniel Battle, an inmate serving a sentence for attempted homicide, testified that in November 2007, he was housed in guild twelve in Charles Bass. After the incident between the appellant and the victim, Battle spoke with Agent Fisher, who recorded the conversation. Battle said that although he was illiterate, he signed a statement given to him by Agent Fisher.

Battle said that he and the victim were incarcerated together. Battle did not see any of the victim's injuries, but the victim told Battle that he had been injured during the altercation.

Battle said that he did not remember telling Agent Fisher that he heard the victim and the appellant "having some words about cigarettes." Battle acknowledged that he was subpoenaed to testify and that he told the State he did not want to get involved and did not want to testify. Battle said that the description of events he gave to Agent Fisher was based on what he heard, not what he saw.

To impeach Battle, the State played the audio recorded statement Battle gave Agent Fisher. At the beginning of the recorded statement, Agent Fisher asked Battle if he swore and affirmed to tell the truth, and Battle responded affirmatively. Agent Fisher stated that he and Battle had spoken for five or ten minutes before the audio recording began. Agent Fisher then summarized their conversation, and Battle confirmed statements he made about the altercation. According to Battle, he was outside of his cell during the fight. He said that the appellant and the victim exchanged words about some cigarettes. The argument became more serious, and the appellant hit the victim in the eye. The victim went into the office to speak with the guards, and one of the officers started "writing [the appellant] up." The appellant walked into the office and began hitting the victim. The victim fell to the floor, and the appellant repeatedly stomped and kicked him. The altercation lasted around five to ten minutes. Officer Smart was unable to stop the assault. Battle asserted that the victim never fought back.

After the statement was played, Battle acknowledged that he told Agent Fisher the appellant repeatedly kicked and stomped the victim in the face. However, he maintained that he did not see the incident and that a fellow inmate who was watching the events stood in the

-5-

doorway of Battle's cell and described the events to Battle. Battle said that he heard the altercation, specifically noting that he heard Officer Smart yell "stop." He denied that he told Agent Fisher he saw the altercation. Battle said that he helped clean up after the altercation. He said, "[I]t wasn't too much [blood]. I guess a big pile of it."

Curtis Lee Majors testified that in November 3, 2007, he was housed in guild twelve at Charles Bass, serving a sentence for a parole violation and tampering with evidence. After witnessing the incident in guild twelve, Majors gave a statement to Agent Fisher. Majors said that because he could not read or spell, Agent Fisher wrote the statement, and Majors signed it.

Majors said that on November 3, he was at a card table with the appellant when the victim came into the building. The appellant saw the victim, walked over to him, and said something Majors could not hear. The victim raised his hands as if he were defending himself, then he went into the office. The appellant knocked on the window of the office and was allowed inside. The appellant and the victim began arguing and came out of the office fighting.

On cross-examination, Majors said that on the day of the altercation, the appellant and Battle were playing cards when the victim came into guild twelve. The appellant threw his cards on the table and said, "[T]here the dude went." The appellant "hollered" at the victim, and when the victim raised his hands, the appellant hit him. The victim then told the officers about the altercation. The appellant followed the victim into the office, and a fight ensued.

On redirect examination, Majors said that after the victim fell, the appellant continued to kick and stomp the victim. Officer Smart repeatedly told the appellant to stop, but the appellant refused to comply. The victim "was just laying there . . . on his stomach and head, blood coming out of his mouth, blood coming out of his ears and out his eyes. He was just terminally bleeding."

Lieutenant Kenny Ray Steele testified that on November 3, 2007, he was employed at Charles Bass but that he had since retired. Lieutenant Steele stated that on November 3, he responded to an officer in distress call from guild twelve. The call was later upgraded to a request for medical assistance. Lieutenant Steele said that another supervisor, Corporal Brooks, also responded to the call and that he arrived before Lieutenant Steele. When Lieutenant Steele arrived on the scene, he saw the victim lying on the floor. The victim was not moving, and a large pool of blood was around his head. After Corporal Addison identified the perpetrator, Lieutenant Steele and Corporal Brooks found the appellant. The appellant said, "[H]ell, yeah, that he had beat him down and he was proud of it." Lieutenant Steele saw no injuries on the appellant.

Frieda Scott, the assistant director of medical information services at Vanderbilt Hospital, testified that the victim was admitted to the hospital on November 3, 2007, and that he was discharged on November 9, 2007.

Patricia Lee Holmes, the chief compliance officer for Nashville General Hospital, testified that the victim was admitted on November 9, 2007, and was discharged on January 11, 2008. She stated that the discharge summary noted that the victim had "post-head trauma," problems swallowing, and a feeding tube.

Maxine Harville, a registered health information manager at DeBerry, testified that special needs inmates are sent to DeBerry for nursing care or mental health treatment. Harville testified that the victim was admitted to DeBerry on January 11, 2008, and that he remained there until July 11, 2008, when he was paroled.

Diane Baugh, the victim's sister, testified that around November 3, 4, or 5, 2007, she visited the victim in the trauma unit of Vanderbilt Hospital. At that time, the victim's face and head were swollen, and he was on a ventilator. The victim was heavily sedated and restrained so he could not disturb the devices attached to him. Baugh spoke to the victim, but he did not respond. The victim was later moved to the intensive care unit (ICU) of Nashville General Hospital, and Baugh visited him at that location. The victim regained consciousness two or three weeks later, but he did not recognize Baugh until about three weeks after he was released from ICU.

Baugh said that before the incident, the victim was bright, intelligent, and worked as an electrician. Afterward, the victim lost some cognitive function and had problems with his memory. She said, "[N]ow he just sits and looks." Baugh said that the victim lived with their mother and received government disability assistance. Baugh was appointed his conservator. Baugh said that at the time of trial, the victim was still under a doctor's care.

Chauncey Robinson testified for the defense. Robinson said that on November 3, 2007, he was incarcerated in guild twelve at Charles Bass. After the incident between the appellant and the victim, Robinson spoke with Agent Fisher and "told him I didn't know nothing because he was trying to coach me on what to say." Robinson maintained that Agent Fisher tried to get him to say he knew what happened and that the appellant "was in the wrong."

Robinson said that the appellant knew his father and that while Robinson and the appellant were incarcerated together, they talked and played cards. Robinson said that on the morning of November 3, he was at a table in the recreation area playing cards with the appellant, Charles Woo, and Michael Visa when Corporal Addison let the victim into guild

twelve. The victim went into the office for a minute then came out with an officer. Robinson said the victim approached the appellant from behind in a threatening manner and "stuck his hands in his pocket like he was pulling out" something Robinson thought was the handle of "a homemade shank" that was "wrapped in [torn] sheets." Robinson said the victim appeared angry. Robinson said the appellant hit the victim to defend himself. Robinson said he saw Officer Smart "panicking," while Corporal Addison was "just sitting in the chair like ain't nothing going on."

Robinson said that he and Charles Henderson grabbed the appellant and restrained him. Robinson estimated the fight lasted a couple of minutes. Robinson never saw the shank again, but he said that Corporal Addison picked up something from the floor.

On cross-examination, Robinson said the appellant was standing over the victim, but he was not stomping or kicking him. Robinson confirmed that the victim never said anything to the appellant.

Robinson maintained that when he was interviewed after the altercation, he told Investigator Coleman about seeing the shank. When he was shown his statement, which reflected that he told Investigator Coleman he did not see a weapon, he said the statement was incorrect. Robinson acknowledged that he and the appellant were friends.

Charles Henderson, an inmate serving a sentence for aggravated robbery, testified that on November 3, 2007, he was incarcerated in guild twelve at Charles Bass. He said that he was playing cards at a table in the back part of the guild with the appellant, Robinson, and Michael Visa. When the victim came into the guild, he started talking to someone. Henderson thought the victim looked suspicious because he was wearing a coat even though it was not cold. After he finished his conversation, the victim stood with his hands in his pockets, watching the men play cards. The victim said something to the appellant, the appellant stood, and they argued. Henderson said when the victim's hands came out of his pockets, the appellant "grabbed his arm like he had something like he was trying to take it." Henderson said he could not see the object because it happened too quickly. A fight ensued, and the appellant and the victim traded punches. Henderson said the victim dropped something during the fight. Henderson saw the appellant hit the victim, and the victim fell to the floor. Henderson and Robinson pulled the appellant away from the victim and tried to calm the appellant and see if he was injured. Henderson stated that the appellant's mouth was bleeding. Henderson estimated the fight lasted about three minutes. He did not know of any prior altercation between the appellant and the victim.

On cross-examination, Henderson said that Battle and other inmates were watching the group play cards. He acknowledged that he never saw metal or a weapon. Henderson

stated that he and Robinson grabbed the appellant immediately after the victim fell to the floor because he thought the appellant would continue to hit the victim. Henderson conceded that the victim was unconscious. He admitted that he never told investigators that he saw the altercation.

In rebuttal, the State called Hugh Coleman, an investigator with the District Attorney General's office who was formerly employed by the Metropolitan Nashville Police Department. Coleman said that prior to testifying at trial, he spoke with Robinson. Robinson said that the victim came into the guild, spoke with a guard for a few seconds, then walked over to the appellant. Robinson said there was no conversation between the appellant and the victim. Coleman asked Robinson if he saw the victim with a knife or other weapon, and Robinson said he did not. Robinson never mentioned seeing the victim pull an object from his pocket or seeing the sheet-wrapped handle of a shank.

On cross-examination, Coleman acknowledged that he never questioned Robinson about seeing a shank, but he repeated that he asked Robinson if he saw a weapon.

Major Kevin Cox of the Davidson County Sheriff's Office testified that he was present throughout trial and observed the appellant, Robinson, and Henderson. As the men went to lunch, they did not interact. However, as they returned from lunch, the appellant told Robinson and Henderson, "[T]ake care of your business, do what you gotta do."

On cross-examination, Major Cox conceded that he did not know what the appellant's comment meant.

At the conclusion of the trial, the jury found the appellant guilty of attempted second degree murder and aggravated assault. The trial court merged the aggravated assault conviction into the attempted second degree murder conviction and imposed a nineteen-year sentence.

On appeal, the appellant challenges the sufficiency of the evidence sustaining his attempted second degree murder conviction,[2] the trial court's denial of the appellant's motion for continuance based upon an unavailable witness, the trial court's admission of an alleged hearsay statement by a witness, and the trial court's admission of statements by the appellant that were not timely disclosed during discovery.

---

[2] The appellant maintains that the evidence was insufficient to sustain his conviction of criminal responsibility for second degree murder; however, he was not convicted under a theory of criminal responsibility.

## II. Analysis

### A. Motion for Continuance

In his brief, the appellant asserts that prior to trial, he attempted to serve a subpoena on Officer Nelson Ganns to appear on the appellant's behalf at trial but was unable to locate him. The appellant moved for a continuance to attempt to find Officer Ganns, but the trial court denied his request. The appellant contends that Officer Ganns' testimony was critical to his defense and that he was prejudiced by the trial court's denial of a continuance.

The appellant's brief does not provide citations to the record in support of his contention. Moreover, we can find nothing in the record relating to this issue. Thus, we conclude that the appellant has waived this issue. See Tenn. R. App. P. 27(a)(7); see also Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### B. Prior Inconsistent Statement

Next, the appellant asserts that the trial court erred in admitting Battle's statement to Agent Fisher. The appellant argues that the statement consisted of hearsay and did not comply with any exception to the prohibition against hearsay. Specifically, the appellant contends that the statement did not fall under the exception contained in Rule 803(26) of the Tennessee Rules of Evidence because the statement was not made under circumstances indicating trustworthiness.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. Tennessee Rule of Evidence 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement. The statement is admissible as substantive evidence if the following conditions are satisfied:

> 1. The statement must be admissible under Tennessee Rule of Evidence 613(b).
>
> 2. The declarant must testify at the trial or hearing and be subject to cross-examination about the statement.
>
> 3. The statement must be audio or video recorded, written and

signed by the witness, or given under oath.

    4.  The trial court must conduct a jury-out hearing to determine
by a preponderance of the evidence that the prior statement was
made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) & Advisory Comm'n Cmts. Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

During cross-examination, the State questioned Battle extensively regarding the differences between his prior recorded statement and his trial testimony, and, at the conclusion of Battle's testimony, the State moved to admit the recorded statement as substantive evidence. The appellant objected, arguing that "[f]or the most part[,] . . . it's a statement by [Agent] Fisher and Mr. Battle is more or less agreeing with it." Moreover, the appellant argued that the statement was not trustworthy in that Battle claimed the statement was hearsay.

The trial court found that the requirements of Rule 803(26) were satisfied, specifically noting that Battle was given the opportunity to review and explain his statement, he was subject to cross-examination about it, the statement was audio recorded, and that the statement was given under circumstances indicating trustworthiness, due partly to Battle making an oath of truthfulness prior to giving the statement. The trial court further found that the statement was "inconsistent with what Mr. Battle's now saying in the sense that he's now saying he didn't witness anything. He acknowledges to the agent and then in his own words what he witnessed." Therefore, the trial court allowed Battle's prior inconsistent statement to be admitted as substantive evidence. See State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998); State v. Kendricks, 947 S.W.2d 875, 881 (Tenn. Crim. App. 1996). The trial court did not err in admitting the statement as substantive evidence. See State v. Charles Jackson, No. W2010-01133-CCA-R3-CD, 2012 WL 543047, at *9-11 (Tenn. Crim. App. at Jackson, Feb. 17, 2012).

## C. Discovery

The appellant argues that two weeks prior to trial, the State supplemented their discovery response with the appellant's statement to Officer Smart that he was trying to kill the victim. The appellant maintains that the trial court erred by denying his motion to exclude the statement because of the State's failure to provide it in a timely manner. The

appellant argues that he had insufficient time to prepare for the statement to be used at trial and that his opportunity to interview Officer Smart prior to trial was limited.

At a hearing held immediately prior to trial, defense counsel moved to exclude incriminating statements made by the appellant. Defense counsel informed the trial court that the State provided supplemental discovery "ten-days to two-weeks ago," which included the appellant's statement to Officer Smart that he intended to kill the victim. Defense counsel stated that after the disclosures, he attempted to interview Officer Smart but that she declined his request. Defense counsel complained that the incriminating statement was not timely disclosed.

The trial court responded that defense counsel could attempt to speak with Officer Smart before trial began. The trial court informed defense counsel that Officer Smart could be cross-examined about her failure to mention the appellant's incriminating statement in other interviews. The trial court stated that defense counsel's trial preparation was likely not affected because Officer Smart was unwilling to speak with defense counsel.

Tennessee Rule of Criminal Procedure 16 governs the rights of parties in a criminal proceedings regarding discovery and inspection. In pertinent part, Rule 16(a)(1)(F) provides that

> [u]pon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession or control and:
>
>> (i) the item is material to preparing the defense;
>>
>> (ii) the government intends to use the item in its case-in-chief at trial; or
>>
>> (iii) the item was obtained from or belongs to the defendant.

Initially, we note that discovery is always triggered by a motion from the defendant. Tenn. R. Crim. P. 16, Advisory Comm'n Cmts. However, the appellant's motion for discovery is not included in the record for our review, arguably waiving any issue related to discovery. See Tenn. R. App. P. 24(b); see also State v. Brian W. Gaines, No. 03C01-9709-CC-00385, 1998 WL 619079, at *3 (Tenn. Crim. App. at Knoxville, Sept. 16,

1998). Nevertheless, we will address this issue.

We note that the State never explained why the incriminating statement was not disclosed as part of the initial discovery materials. Nevertheless, the decision whether to impose a sanction and what sanction is appropriate for a delayed compliance with discovery rests within the sound discretion of the trial court. See State v. Collins, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000); State v. Street, 768 S.W.2d 703, 710 (Tenn. Crim. App. 1988). Moreover, the appellant bears the burden of demonstrating "the degree to which the impediments to discovery hindered trial preparation and defense at trial." State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).

The trial court ruled that the appellant suffered no prejudice to his trial preparation. The appellant makes no argument regarding what he would have done differently had the incriminating statement been disclosed earlier and conceded that Officer Smart refused to be interviewed. Therefore, the only avenue left to counsel was to cross-examine Officer Smart about the statement, which counsel did. Accordingly, we conclude the trial court did not err in admitting the incriminating statement.

### D. Sufficiency of the Evidence

Finally, we will address the appellant's challenge to the sufficiency of the evidence supporting his attempted second degree murder conviction. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20); see also State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000).

Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

The appellant argues that the State failed to prove that he acted knowingly. We disagree. The proof at trial revealed that when the victim went to the office to report an incident that happened between himself and the appellant, the appellant entered the office and tried to dissuade the guards from filing a report. When his efforts were unsuccessful, the appellant began hitting the victim. The fight progressed out of the office to the area in front of cell doors. After the victim fell to the floor, unconscious, the appellant continued to repeatedly kick and stomp the victim in the head with his boot-clad feet. The appellant later told Officer Smart that he intended to kill the victim.

Generally, whether the appellant "knowingly" attempted to kill his victim is a question of fact for the jury. Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence. State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). We conclude that the jury could have found from the foregoing facts that the appellant knowingly attempted to kill the victim, thereby establishing the offense of attempted second degree murder.

### III. Conclusion

In sum, we conclude that there was sufficient evidence adduced at trial to sustain the appellant's conviction and that the trial court did not err in its evidentiary rulings. Accordingly, the judgment of the trial court is affirmed.

_____
NORMA McGEE OGLE, JUDGE